# EXHIBIT A

Robert F. Salvin, Esq., No. 50991
Two Bala Plaza, Suite 300
Bala Cynwyd, PA  19004-1573
215-300-2388
215-271-2820 (fax)
robert.salvin@outlook.com                    Counsel for Plaintiff

---

| | |
|---|---|
| **KEITH R. FENWICK,** | COURT OF COMMON PLEAS, DELAWARE COUNTY, PENNSYLVANIA |
| Plaintiff, | |
| v., | |
| **DELAWARE TITLE LOANS, INC.,** | |
| Defendant. | |

## Complaint

Keith R. Fenwick files this complaint against Delaware Title Loans for usury in violation of the Loan Interest and Protection Law ("Act 6"), 41 P.S. §§ 201 *et seq.* and several other claims. The defendant operates a loan sharking scam, and victimized Mr. Fenwick with a loan at **155.32% A.P.R.** secure by his car in Pennsylvania.  Mr. Fenwick avers:

## Parties

1.    The plaintiff is Keith R. Fenwick ("Mr. Fenwick"), a citizen of the Commonwealth of Pennsylvania residing at 7332 Radbourne Rd., Upper Darby, PA 19082.

2.     Delaware Title Loans, Inc. ("DTL") is a corporate entity believed to be chartered in the state of Delaware with an office at 155 Naamans Road, Claymont, DE 19703.

### Background

3.     DTL runs a sophisticated loan sharking operation in which it makes small loans at triple digit interest rates to consumer borrowers secured by their cars. These loans are used to exploit borrowers with poor credit and a crushing need for cash. Exhibit P-1.

4.     DTL is engaged in asset based lending in Pennsylvania. In the past, DTL has admited to collecting over $3.8 million in usurious interest from Pennsylvanians borrowers. Exhibit P-2.

5.     For each loan DTL makes to a customer in Pennsylvania, DTL acquires a property interest in collateral located in the Commonwealth and records a lien on the collateral with the Pennsylvania Department of Transportation.

6.     At any given time, DTL is believed to have security interests in hundreds of thousands of dollars of automotive collateral located in Pennsylvania.

7.     DTL has collection agents under contract within Pennsylvania.  Exhibit P-3. Through its agents, DTL maintains a constant, regular, and systematic physical presence within the territorial boundaries of Pennsylvania.

8.     DTL maintains an interactive website from which citizens of Pennsylvania may apply for and receive loans from their homes in Pennsylvania.  Exhibit P-4.

9.      DTL accepts payments on-line and over the phone from borrowers in Pennsylvania.

10.     Pennsylvania's usury statute is unwaivable, but DTL insists that Pennsylvania borrowers waive the law's protection by signing loan agreements containing a Delaware choice-of-law clause. 41 P.S. § 408 ("***Notwithstanding any other law*** [which includes Delaware law], the provisions of  . . .  [Pennsylvania's usury statute] may not be waived by any oral or written agreement executed by any person.").

11.     According to the Pennsylvania Department of Banking and Securities, out-of-state auto title lenders are doing business within the Commonwealth and subject to Act 6 as long as they take any action in the Commonwealth, such as taking collateral, accepting online payments, or accepting online loan applications.  Consent Order ¶¶ 4-16, *Commonwealth of Pennsylvania v. Carbucks of Delaware, Inc.*, No. 18-0066 (Pa. Dept. Banking and Securities 2018) (attached as Exhibit P-5).

<u>Facts</u>

12.     On or about May 13, 2006, Mr. Fenwick borrowed $896 from DTL at a high triple digit rate of interest. Exhibit P-6 at 1-3.

13.     Over the next several months, Mr. Fenwick paid $1,327.00 on the loan, but due to the high rate of interest just about all of the funds were applied to interest. Exhibit P-6 at 3.

14.     On or about September 5, 2020, Mr. Fenwick was short on funds due to the Covid-19 pandemic, and he again resorted to getting a loan from Delaware Title Loans.

15.     Before Delaware Title Loans would give him a new loan it required him to pay $200 on his 2006 loan. Exhibit P-6 at 3.

16.     DTL then allowed Mr. Fenwick to take out a new loan. The new loan was $816.00 at 155.32% A.P.R. Payments were due every two weeks for two years, for a total $2,688.73. The finance charge was $1,872.73. Exhibit P-6 at 5.

17.     DTL paid $81 of the loan proceeds to the Pennsylvania Department of Transportation to record a lien on the title. Exhibit P-6 at 5.

18.     DTL also paid $85 of the proceeds for a membership in something called the Liberty Motor Club. Exhibit P-6 at 5.

19.     DTL purchase the Liberty Motor Club membership for Mr. Fenwick without asking his permission and without telling him.

20.     DTL was apparently able to retain part of the Liberty Motor Club membership fee as a kickback. Exhibit P-6 at 5 (text following asterisk at the bottom of the itemization of the amount financed).

21.     Mr. Fenwick received $650 of loan funds in hand.

22.     DTL closed the transaction electronically at a counter with a computer.

23.     A DTL employee stood behind a counter and prepared the loan agreement on a computer. The computer faced the employee and not Mr. Fenwick.

24.     At no time was Mr. Fenwick able to view the computer screen or operate the computer.

4

25.    Several months after the transaction was completed, in January, 2021, Mr. Fenwick, through counsel, requested a copy of the contract, and he received the document attached as Exhibit P-6.

26.    This was the first time Mr. Fenwick saw the document DTL claims to be the loan agreement, including the Truth in Lending disclosure on page one of the agreement. Exhibit P-6 at 5. Mr. Fenwick denies seeing the agreement when he took out the loan, either as an image on a computer screen or as a paper document.

27.    Instead of bearing Mr. Fenwick's hand written signature, the signature line on the contract has a typed statement "E-SIGNED by KEITH FENWICK." Exhibit P-6 at 9.

28.    Mr. Fenwick denies taking any action on the computer while he was at DTL that would cause his electronic signature to appear on the document. The DTL employee did not allow Mr. Fenwick to operate the computer.

29.    Over the next several months, Mr. Fenwick paid a total of $483.57 to DTL (Exhibit P-6 at 4), but due to the high rate of interest DTL applied just about all of Mr. Fenwick's payments to interest, just about all of which was illegal under Pennsylvania law.

30.    By January 2021, despite paying $481.57, the principal balance on Mr. Fenwick's loan had gone down only $30.82 to $785.18 (Exhibit P-6 at 4), and DTL claimed that Mr. Fenwick owed an additional $60.48 in interest, so his total balance was $845.66, even more than at the beginning of the loan.   Exhibit P-6 at 4. In other words, Mr. Fenwick's loan balance went up $29.66 even though he paid $483.57.

31.    Mr. Fenwick refused to pay more to DTL.

5

32.     According to the contract, DTL purports to have taken a security interest in Mr. Fenwick's 2008 Lincoln MKX, and recorded a lien with the Pennsylvania Department of Transportation.

33.     The vehicle is titled and registered in Pennsylvania, and Mr. Fenwick keeps the vehicle at his home in Pennsylvania.

34.     The interest on the loan continues to grow, and DTL is maintaining a lien on Mr. Fenwick's vehicle to coerce payment of usurious interest.

## Count I

35.     This count is for usury under Act 6, 41 P.S. §§ 201, 408 & 501-504, and seeks declaratory relief and damages.  All of the preceding paragraphs are incorporated by reference.

36.      Under section 408 of Act 6, Mr. Fenwick's right to be free from usury cannot be waived.

37.     Under section 201, DTL may not charge Mr. Fenwick interest greater than 6% per annum.

38.     Under Section 501, Mr. Fenwick is not liable to pay usurious interest.

39.     Under Section 504, Mr. Fenwick is entitled to relief for all damages sustained as a result of being party to a usurious loan.

40.     Under Section 502, Mr. Fenwick is entitled to a mandatory award of three times the excess interest he paid. *Grigsby v. Thorp Consumer Discount Co.,* 127 B.R. 759, 764 (E.D. Pa. 1991).

6

41.     DTL applied $450.75 of Mr. Fenwick's payments to interest, just about all of which was illegal, Mr. Fenwick is entitled to an award of three times the funds applied to illegal interest, albeit with a set off for any balance legitimately due on the loan.

WHEREFORE, Mr. Fenwick seeks the following relief:

(a).    A declaration that the loan (i) is governed by Pennsylvania law, (ii) accrues interest at the rate of 6% per annum, (iii) that Mr. Fenwick is entitled to the return of his title free and clear after repaying the balance due on the loan at 6% annual interest;

(b).  An award of actual and treble damages, including three times the amount of any funds applied to usurious interest, and compensation for the value of the vehicle should it be repossessed;

(d).  An award of attorney's fees and costs; and

(e).  Any other relief that is just and appropriate.

## Count II

42.     This count is against DTL for engaging in unfair and deceptive acts and practices in violation of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § § 201-3. All of the preceding paragraphs are incorporated by reference.

43.     The Unfair Trade Practices and Consumer Protection Law ("UTPCPL") renders it unlawful for any person engaged in a trade or business to commit unfair and deceptive acts and practices. 73 P.S. § 201-3.

44.     The defendant is a person engaging in a trade or business within the meaning of the UTPCPL.

45.     DTL engaged in unfair and deceptive acts, including, but not limited to:

7

(a).     Misrepresenting to Mr. Fenwick in violation of 73 P.S. § 201-2(4) (ii), (v), (vii) & (xxi), that it could charge him interest at the rate of 155.32% A.P.R. even though the rate is illegal under Pennsylvania law;

(b).     Misrepresenting to Mr. Fenwick in violation of 73 P.S. § 201-2(4) (ii), (v), (vii) & (xxi), that he owed monthly payments far in excess of his actual liability at the legal rate of interest,

(c).     Misrepresenting to Mr. Fenwick that he owed money he did not actually owe; and

(d).     Misrepresenting to Mr. Fenwick that he was bound to a contract he did not sign.

46.     The various misrepresentations referenced above include verbal and written statements of the loan balance, applicable interest rate, and monthly payment amount uttered to Mr. Fenwick at every step of the transaction, before, during, and after execution of the loan documents.

47.     DTL's actions and representations were fraudulent or deceptive and created a likelihood of confusion over the nature and amount of Mr. Fenwick' liability.

48.     Specifically, DTL deceived Mr. Fenwick into believing that his payment and debt were much higher than they actually were.

WHEREFORE, Mr. Fenwick requests relief jointly and severally as follows:

(a).     An award under 73 P.S. § 201-9.2 of up to three times the amount of all actual damages suffered by Mr. Fenwick, including compensation for the loss of his vehicle should it be repossessed;

8

(b).    Award Mr. Fenwick reasonable attorney's fees and costs; and

(c).    Any other relief that is just and appropriate.

## Count III

49.    This count is against DTL for violation of the Truth-In-Lending Act, 15 U.S.C. §§ 1601 *et seq.* All of the preceding paragraphs are incorporated by reference.

50.    DTL failed to show Mr. Fenwick the material Truth-In-Lending disclosures prior to inserting his signature on the contract. Mr. Fenwick never saw the annual percentage rate, finance charge, amount financed, total payments, total sale price, or the itemization of the amount financed until he requested a copy of the loan contract in January 2021.

51.    Without allowing Mr. Fenwick to view the computer monitor or giving him control over the computer to review the contract himself, Mr. Fenwick had no meaningful opportunity to view the Truth In Lending Disclosures when he was taking out the loan.

52.    Even if Mr. Fenwick had seen the disclosures, they were inaccurate.

53.    DTL disclosed an unlawful usurious rate of interest that did not accurately reflect Mr. Fenwick's legal obligation in violation of 12 C.F.R. §1026.17(c).

54.    DTL did not accurately calculate the finance charge.

55.    DTL involuntarily included purchase of Liberty Motor Club contract in the sale as an incident to the extension of credit.

9

56.     The cost of the Liberty Motor Club should have been included in the finance charge, rather than the amount financed, since DTL included the charges involuntarily.

57.     Even if Mr. Fenwick had seen the Truth In Lending Disclosures on the computer screen, the disclosures would still be invalid because Mr. Fenwick did not consent to receive electronic Truth in Lending disclosures in accordance with 12 C.F.R. § 1026.17(a)(1) and 15 U.S.C. § 7001(c).

WHEREFORE, Mr. Fenwick requests judgment against the defendants, jointly and severally, for actual and statutory damages along with attorney's fees and costs and any other relief that is just and appropriate.

Respectfully submitted,

_____
ROBERT F. SALVIN, Esq.,
Counsel for Plaintiff.

<u>Verification</u>

   I, Keith R. Fenwick, declare under penalty of perjury that the facts recited in the foregoing document that was prepared by my lawyer are true and correct to the best of my knowledge, information and belief.  I understand that false statements herein are subject to penalties under of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

_____

11

## <u>Verification</u>

I, Keith R. Fenwick, declare under penalty of perjury that the facts recited in the foregoing document that was prepared by my lawyer are true and correct to the best of my knowledge, information and belief.  I understand that false statements herein are subject to penalties under of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

11

The New York Times

# Rise in Loans Linked to Cars Is Hurting Poor

By Jessica Silver-Greenberg and Michael Corkery    December 25, 2014 12:13 pm

**Related Links**

Miss a Payment? Good Luck Moving That Car (Sept. 24, 2014)

In a Subprime Bubble for Used Cars, Borrowers Pay Sky-High Rates (July 19, 2014)

The rusting 1994 Oldsmobile sitting in a driveway just outside St. Louis was an unlikely cash machine.

That was until the car's owner, a 30-year-old hospital lab technician, saw a television commercial describing how to get cash from just such a car, in the form of a short-term loan.

The lab technician, Caroline O'Connor, who needed about $1,000 to cover her rent and electricity bills, believed she had found a financial lifeline.

"It was a relief," she said. "I did not have to beg everyone for the money."

Her loan carried an annual interest rate of 171 percent. More than two years and $992.78 in debt later, her car was repossessed.

"These companies put people in a hole that they can't get out of," Ms. O'Connor said.

The automobile is at the center of the biggest boom in subprime lending since the mortgage crisis. The market for loans to buy used cars is growing rapidly.

And similar to how a red-hot mortgage market once coaxed millions of borrowers into recklessly tapping the equity in their homes, the new boom is also leading people to take out risky lines of credit known as title loans.

They are, roughly speaking, the home equity loans of subprime auto. In these loans, which can last as long as two years or as little as a month, borrowers turn over the title of their cars in exchange for cash — typically a percentage of the cars' estimated resale values.

"Turn your car title into holiday cash," TitleMax, a large title lender, declared in a recent television commercial, showing a Christmas stocking overflowing with money.

More than 1.1 million households in the United States used auto title loans in 2013, according to a survey by the Federal Deposit Insurance Corporation — the first time the agency has included the loans in its annual survey.

Title loans are an increasingly prevalent form of high-cost, short-term credit in subprime finance, as regulators in a number of states crack down on payday loans.

For many borrowers, title loans, also sometimes known as motor-vehicle equity lines of credit or title pawns, are having ruinous financial consequences, causing owners to lose their vehicles and plunging them further into debt.

3

**One subscription. Endless discovery.**                                        SEE MY OPTIONS

# Exhibit P-1

A review by The New York Times of more than three dozen loan agreements found that after factoring in various fees, the effective interest rates ranged from nearly 80 percent to over 500 percent. While some loans come with terms of 30 days, many borrowers, unable to pay the full loan and interest payments, say that they are forced to renew the loans at the end of each month, incurring a new round of fees.

Customers of TitleMax, for example, typically renewed their loans eight times, a former president of the company disclosed in a 2009 deposition.

And because many lenders make the loan based on an assessment of a used car's resale value, not on a borrower's ability to repay that money, many people find that they are struggling to keep up almost as soon as they drive off with the cash.

As a result, roughly one in every six title-loan borrowers will have the car repossessed, according to an analysis of 561 title loans by the Center for Responsible Lending, a nonprofit in Durham, N.C.

The lenders argue that they are providing a source of credit for people who cannot obtain less-expensive loans from banks. The high interest rates, the lenders say, are necessary to offset the risk that borrowers will stop paying their bills.

Title loans are part of a broader lending boom tied to used cars. Auto loans allowing subprime borrowers — those with credit scores at 640 or below — to buy cars have surged in the last five years.

The high interest rates on the loans have enticed an influx of Wall Street money. Private equity firms are investing in lenders, and some big banks are ramping up their auto lending to people with blemished credit.

Propelling this lending spree are the cars themselves, and their centrality in people's lives.

In most parts of the country, a car is vital to participating in the work force, and lenders are betting that people will do virtually anything to keep their cars, choosing to make auto loan payments before paying for just about any other expense.

The title lending industry, perhaps more than any other facet of subprime auto lending, thrives because of the car's importance.

While people seeking title loans are often at their most desperate — dealing with a job loss, a divorce or a family illness — the lenders are willing to extend them loans because they know that most borrowers will pay their bill to keep their cars. Some lenders do not even bother to assess a borrower's credit history.

"The threat of repossession turns the borrower into an annuity for the lenders," said Diane Standaert, the director of state policy at the Center for Responsible Lending.

Unable to raise the thousands of dollars he needed to repair his car, Ken Chicosky, a 39-year-old Army veteran, felt desperate. He received a $4,000 loan from Cash America, a lender with a storefront in his Austin, Tex., neighborhood.

The loan, which came with an annual interest rate of 98.3 percent, helped him fix up the 2008 Audi that he relied on for work, but it has sunk his credit score. Mr. Chicosky, who is also attending college, uses some of his financial aid money to pay his title-loan bill.

3      **One subscription. Endless discovery.**                    SEE MY OPTIONS

**Exhibit P-1**

Mr. Chicosky said he knew the loan was a bad decision when he received the first bill. It detailed how he would have to pay a total of $9,346 — a sum made up of principal, interest and other fees.

"When you are in a situation like that, you don't ask very many questions," he said.

Cash America declined to comment.

**Rapid Expansion**

Clutching handfuls of cash, a former Miss America contestant zips around in a red sports car, dancing and rapping about how TitleMax has "your real money."

Commercials like these help companies like TitleMax entice borrowers to take on the costly loans. TitleMax, a brand of TMX Finance, is privately held — like virtually all of the title loan companies — and does not disclose much financial information. But a regulatory filing for the first three months of 2013 offers a glimpse into the industry's tremendous growth.

During that period, the profits at TMX Finance rose by 47 percent from the same period two years earlier, and the number of stores it operated nearly doubled, to 1,108. The total volume of loans originated during the first three months of last year reached $169 million, up 67 percent from the same period in 2011.

TMX Finance, based in Savannah, Ga., wants to expand further, opening stores in states where regulations are "favorable," according to a 2013 regulatory filing. Only a few years after emerging from bankruptcy in 2009, the company is enjoying an influx of cash from mainstream investors. Big bond funds managed by Legg Mason and Putnam Investments have bought portions of TMX Finance's debt. The company also borrowed $17.5 million to buy a private jet.

The title lenders are seizing upon a broad retrenchment among banks, which have become wary of making loans to borrowers on the fringe of the financial system. Regulations passed after the financial crisis have made it much more expensive for banks to make loans to all but the safest borrowers.

The title lenders are also benefiting as state authorities restrict payday loans, effectively pushing payday lenders out of many states. While title loans share many of the same features — in some cases carrying rates that eclipse those on payday loans — they have so far escaped a similar crackdown.

In 21 states, car title lending is expressly permitted, with title lenders charging interest of up to 300 percent a year. In most other states, lenders can make loans with cars as collateral, but at lower interest rates.

Seeing the regulatory landscape shift, some of the country's largest payday lenders are switching gears. When Arizona effectively outlawed payday loans, ACE Cash Express registered its payday loan storefronts in the state as car title lenders, state records show.

Lenders made similar changes in Virginia, where lawmakers outlawed payday lending in 2010. But title lenders were untouched by that law and have expanded throughout the state, drawing business from Maryland.

The number of stores offering title loans in Virginia increased by 24 percent from 2012 to 2013, according to state records. Last year, the lenders made 177,775 loans, up roughly 612 percent from 2010, when the state banned payday lending.

In Tennessee, the number of title lending stores increased by about 22 percent from 2011 to 2013, reaching 1,017.

3

**One subscription. Endless discovery.**                    SEE MY OPTIONS

**Exhibit P-1**

That is a small fraction of the industry's overall size, state regulators say, because only a handful of states keep statistics. Legal aid offices in Arizona, California, Georgia, Missouri, Texas and Virginia report that they have experienced an influx of clients who have run into trouble with the loans.

"The demand is there for people who are desperate for money," said Jay Speer, the executive director of the Virginia Poverty Law Center.

**Loopholes and Adversity**

When Tiffany Capone suggested that her fiancé, Michael, take out a $10,000 TitleMax loan with a 119 percent interest rate, she figured it would be a temporary fix to pay the bills. But this summer, after Michael fell behind on the loan payments, the couple's three-year-old Hyundai was repossessed.

"It had my child's car seat in the back," said Ms. Capone, of Olney, Md.

With their car gone, the couple had to sell most of their furniture and other belongings to a pawnshop so they could afford to pay for taxis to ferry Michael, a diabetic with a heart condition, to his frequent doctors' appointments.

The hardships caused by title loans are being cited as one of the big challenges facing poor and minority communities.

"It is a form of indenture," said Robert Swearingen, a lawyer with Legal Services of Eastern Missouri, adding that "because of the threat of repossession, they can string you along for the rest of your life."

Johanna Pimentel said she and both of her brothers had taken out multiple title loans.

"They are everywhere, like liquor stores," she said.

Ms. Pimentel, 32, had moved her family out of Ferguson, Mo., to a higher-priced suburb of St. Louis that promised better schools. But after a divorce, her former husband moved out, and she had trouble paying her rent.

Ms. Pimentel took out a $3,461 title loan using her 2002 Suburban as collateral.

After falling behind, she woke up one morning last March to find that the car had been repossessed. Without it, she could not continue to run her day care business.

Pointing to such experiences, lawmakers in some states — regulating the industry largely falls to states — have called for stricter limits on title loans or outright bans.

In Virginia, lawmakers passed a bill in 2010 that institutes some restrictions on the practice, including preventing lenders from trying to collect money from customers once a car has been repossessed. That same year, Montana voters overwhelmingly backed a ballot initiative that capped rates on title loans at 36 percent.

But for every state where there has been a crackdown, there are more where the industry has mobilized to beat back regulations.

In Wisconsin, it took the title loan industry only one year to reverse a ban on the loans that had been put in place in 2010. In New Hampshire in 2008, state legislators enacted a law that put a 36 percent ceiling on the rates that title lenders could charge. Four years later, though, lobbyists for the industry won a repeal of the law.

"This is nothing but government-authorized loan sharking," said Scott A. Surovell, a Virginia lawmaker who has proposed bills that would further rein in title lenders.

3   **One subscription. Endless discovery.**                            SEE MY OPTIONS

**Exhibit P-1**

Even when there are restrictions, some lenders find creative ways to continue business as usual. In California, where the interest rates and fees that lenders can charge on loans for $2,500 or less are restricted, some lenders extend loans for just over that amount.

Sometimes the workarounds are more blatant.

The City of Austin allows title lenders to extend loans only for three months. But that did not stop Mr. Chicosky, the veteran who borrowed $4,000 for car repairs, from getting a loan for 24 months.

Last year, after applying for a loan at a Cash America store in Austin, Mr. Chicosky said, a store employee told him that he would have to fill out the paperwork and pick up his check in a nearby town. Mr. Chicosky's lawyer, Amy Clark Kleinpeter, said the location switch appeared to be a way to get around the rules in Austin.

The lender offered a different explanation to Mr. Chicosky. "They told me that they didn't have a printer at the Austin location that was big enough to print my check," he said.

**More Articles in This Series:**
**In a Subprime Bubble for Used Cars, Borrowers Pay Sky-High Rates**
By JESSICA SILVER-GREENBERG and MICHAEL CORKERY

Millions of Americans are receiving auto loans they cannot possibly afford, in a lending climate marked by some of the same lack of caution seen in the housing industry before its 2008 implosion.

**Miss a Payment? Good Luck Moving That Car**
By MICHAEL CORKERY and JESSICA SILVER-GREENBERG

Subprime lenders are increasingly relying on technology that allows them to track and disable delinquent borrowers' vehicles with just a tap of a cellphone app.

A version of this article appears in print on 12/26/2014, on page A1 of the NewYork edition with the headline: Surge in Loans Linked to Cars Is Hurting Poor.

© 2017 The New York Times Company

3

**One subscription. Endless discovery.**

SEE MY OPTIONS

# Exhibit P-1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TIA L. KANEFF,            :
                              :
          **Plaintiff,**       :
     **v.**                     :
                              :
**DELAWARE TITLE LOANS, INC.,**  :     **06-CV-_____**
                              :
                              :
         **Defendant.**     :

### NOTICE OF REMOVAL

Defendant Delaware Title Loans, Inc. ("Delaware Title"), pursuant to 28 U.S.C. §§ 1441, 1446 and 1453, files this Notice of Removal of the above-captioned matter from the Court of Common Pleas of Montgomery County, Pennsylvania, to the United States District Court for the Eastern District of Pennsylvania, and in support avers as follows:

1.     This action was commenced by the filing of a Complaint in the Court of Common Pleas of Montgomery County, Pennsylvania, which is docketed at Case No. 2006-25232. Delaware Title first received a copy of the Complaint on October 4, 2006. This Notice is therefore timely, as it is filed within thirty (30) days of Delaware Title's receipt of a copy of the Complaint.

2.     The basis for removal is the jurisdiction conferred by the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2).

3.     According to the Complaint, Plaintiff and members of the putative class are citizens of the Commonwealth of Pennsylvania. (Compl. at ¶¶ 1, 31.)

4.     Defendant Delaware Title is a Delaware corporation with its principal and only place of business in Delaware. (Compl. at ¶ 2.)

# Exhibit P-2

5.     The Complaint seeks to certify a class of borrowers residing in Pennsylvania who are, will be or during the past four years were indebted to Delaware Title on automobile title loans they obtained at Delaware Title's offices in Delaware. (Compl. at ¶31.) According to the Complaint, the interest rate on all of these loans exceeds the interest rate permitted by Pennsylvania law. Plaintiff asserts, inter alia, claims under the Pennsylvania Loan Interest and Protection Law ("LIPL"), 41 P.S. § 101 et seq., the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201.2 et seq., and the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. § 2270.4(b), pursuant to which Plaintiff seeks, inter alia, actual, statutory and treble damages, attorneys' fees and permanent injunctive relief. Plaintiff also asserts a claim for conversion alleging unlawful repossession of vehicles that were collateral for the loans and seeking, inter alia, damages for loss of the vehicles, including lost income from employment.

6.     Delaware Title expressly denies liability and expressly denies that Plaintiff and the putative class members have actually suffered any damages on account of the conduct alleged in the Complaint or are entitled to any injunction. However, by virtue of the damages and other relief sought by the plaintiff individually and on behalf of the putative class, the amount in controversy exceeds $5,000,000, exclusive of interest and costs. During the past four years (the time period encompassed by the proposed class definition) interest collected on automobile title loans made by Delaware Title's Delaware offices to Pennsylvania residents totaled approximately $3,924,981. The Complaint alleges, inter alia, that Delaware Title's interest rate on these loans (300%) exceeded the 6% interest rate permitted under Pennsylvania's usury statute, Section 201 of LIPL, 41 P.S. §201, and that plaintiff and the putative class members are entitled to three times the illegal interest paid to Delaware Title under Section 502

# Exhibit P-2

of the LIPL, 41 P.S. §502. (Compl., ¶¶ 38-43.) Under plaintiff's theory, interest could be charged and collected by Delaware Title at an annual rate not exceeding 6% simple interest, so that, of the amount collected over the past four years, $78,500 would allegedly be lawful (calculated by multiplying 6/300 by $3,924,981), while $3,846,481 would allegedly be unlawful. The alleged unlawful amount, trebled, substantially exceeds $5 million. Plaintiff's UTPCPL and FCEUA claims, which seek actual and statutory damages, and her conversion claim, which seeks damages for the loss of repossessed vehicles, including lost income from employment, further increase the amount in controversy.

7.    Copies of all process, pleadings, and orders that have been received by Delaware Title are attached hereto collectively as Exhibit 1.

8.    In removing this action to federal court, Delaware Title expressly reserves, and does not waive, any and all rights and defenses that it has or may have.

WHEREFORE, notice is given that this action is removed from the Court of Common Pleas of Montgomery County, Pennsylvania, to the United States District Court for the Eastern District of Pennsylvania.

**mjl0143**

Alan S. Kaplinsky (Pa. I.D. #2446)
Mark J. Levin (Pa. I.D. #26601)
Brooke McDermott (Pa. I.D. #91999)
BALLARD SPAHR ANDREWS
   & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

Attorneys for Defendant
Delaware Title Loans, Inc.

Dated: October 20, 2006

**Exhibit P-2**

# CONTRACT FOR REPOSSESSION SERVICES

This CONTRACT FOR REPOSSESSION SERVICES (hereinafter "Contract") is dated this

_15th__ day of __April__ , 2009_ and is by and between        ___Delaware Title Loans, Inc.__ and

it's subsidiaries, successors, affiliates or assignees (hereinafter "Company") and __International

Recovery Systems, Inc.__ (hereinafter "Vendor").

WHEREAS Company is in the business of making loans to consumers secured by the consumer's motor vehicle;

WHEREAS Company will utilize the services of Vendor to perform repossession and sale services on an independent contractor basis; and

WHEREAS the parties have also entered into an Independent Contractor, Indemnification and Hold Harmless Agreement describing their relationship and nothing in this Contract shall alter or effect this other Agreement; and

WHEREAS the parties now wish to memorialize their understanding with regard to fees and charges;

NOW THEREFORE, in consideration of the mutual promises contained herein, Company using Vendor's services, and the services rendered by Vendor, it is hereby agreed as follows:

1)  Payment. It is understood between the parties that Company will pay Vendor according to the following schedule:

    a)  Repossession Fee: $ _REDACTED_ per vehicle. This fee shall be paid to Vendor for each vehicle that Company requests Vendor to repossess and Vendor successfully delivers to Company. Repossession fees include delivery to designated auction.

    b)  Run-in Fee: $ _REDACTED_ per customer. This fee shall be paid to Vendor for each customer that Vendor causes, through an uncompleted repossession, to pay to Company the amount due the same or next day. Vendor should only halt a repossession attempt before completion if there is a breach of the peace, or with Company's prior consent.

    c)  Storage Fees: $ _REDACTED_ per day, per vehicle, provided that the first _REDACTED_ days of storage shall be free of charge. This fee is the only storage fee to which vendor is entitled and Vendor hereby waives any statutory right to storage fees above this amount, even if the amount entered herein is zero dollars ($0.00).

    d)  Worthless vehicle discovery: $ _REDACTED_ .This will be paid if Vendor discovers the vehicle in such poor condition that Vendor believes the vehicle does not merit the cost of the repossession. In such event Vendor shall provide Company with a picture and condition report justifying this determination.

Rev: 4/19/06

1

IRS-PHL 0001

**Exhibit P-3**

04/15/2009   16:32   7705075798                                          PAGE   03/06

   e) Voluntary Repossessions: $ _ReDACTeD_ . A voluntary repossession is where the
      Lender's customer drops off the vehicle at Lender's address and Lender requests
      Vendor to tow vehicle to auction.

   f) If Vendor does not obtain possession of any vehicle assigned to them within thirty
      (30) days, Company has the right to demand that Vendor cease its efforts and
      Company may assign the repossession of said vehicle to another vendor. In such
      event, Company will not be obligated to pay Vendor for its efforts.

   g) Any other fees need prior written approval.

   h) Special Terms: _____ N/A _____

   _____

   _____

It is hereby agreed between the parties that the above fees are the only fees Company is obligated
to pay Vendor. It is also agreed that invoices for services provided must be submitted in a timely
manner (within 60 days of completion of services). Invoices not submitted/received in a timely
manner may be subject to nonpayment.

2) _Modification._ No agreement, whether written or oral, entered into between the parties prior
to or after the signing of this Contract, including but not limited to any work order forms
used by Vendor, shall alter the terms of this Contract unless this Contract is specifically
referred to by name and date. Further, Vendor acknowledges that the only person authorized
to alter this Contract on behalf of Company is a corporate officer of Company. No office
manager or area manager of Company shall have any authority to alter the terms of this
Contract.

3) _Waiver of Right to Lien / Release of Vehicles upon Demand._ Vendor hereby acknowledges
that Company may have obligations under the law to quickly sell vehicles held by Vendor.
As such, if there is any dispute regarding payment of the above fees, Vendor hereby agrees
that Vendor's sole remedy shall be to pursue its contractual rights against Company and not
to retain possession of any vehicle. Vendor hereby waives any and all rights under
applicable statutes or otherwise to assert any lien on any vehicle held by it on behalf of
Company. Vendor agrees to release any vehicle held by it to Company upon demand.
Vendor further agrees to immediately return to Company all Company loan documents and
keys relating to all vehicles upon demand. Vendor hereby agrees that should it wrongfully
withhold any vehicle, loan documents or vehicle keys from Company after demand has been
made therefore, that Vendor shall be liable to Company for liquidated damages of _ReDACTeD_
per vehicle.

4) _No Right to Set-off._ The parties agree that if the Vendor sells a vehicle on behalf of
Company, vendor may not deduct from the proceeds of such sale its repossession, storage or
sale fees without the prior consent of Company.

5) _Subcontractors._ Vendor hereby agrees not to use a subcontractor to repossess, store or sell a
vehicle without first obtaining the prior consent of Company. If such consent is granted,

2

Rev: 4/19/06

**Exhibit P-3**

04/15/2009  16:32   7705875798                                   PAGE  04/06

Vendor hereby agrees that it shall be solely responsible for the actions of such subcontractor, and hereby agrees to indemnify Company against any action brought against Company relating to the actions of the subcontractor, or a demand for payment from such subcontractor.

6)  Storage and Return of Personal Property.  Vendor shall be solely responsible for the care and storage of all personal property located in repossessed vehicles.  Vendor shall further be solely responsible for returning such personal property to its rightful owner pursuant to law. Vendor agrees to indemnify Company against any claims for lost, stolen or damaged personal property.

7)  Term.  This Agreement shall remain in force and effect until thirty (30) days after notice of termination in writing from either party and all vehicles and loan documents have been returned to Company.


THE ABOVE AGREED TO THIS _15th___ DAY OF ___April__, 2009_.


COMPANY                                    VENDOR International Recovery Systems, Inc.
                                               REPOSSESSION COMPANY

                                           X _____
_____                    (signature)
                                           By: __JEFF  CAHN_____
By: Phil Schappert                                     (print name)
Authorized Agent for Lender                Its: _V. P., GENERAL MANAGER____
                                                        (title)


Rev: 4/19/06                              3

IRS-PHL 0003

# Exhibit P-3



# GET CASH WITH A TITLE LOAN OR SIGNATURE INSTALLMENT LOAN!

When you need fast cash to deal with an unexpected expense in Delaware, a title loan or signature installment loan is an option to consider. Delaware Title Loans, Inc is ready to help you get the cash you need to handle almost any cash emergency. Get started today by filling out the online request form on this page and a Delaware Title Loans, Inc representative will be in touch with shortly after to go over any questions you may have while getting the process started for you. Don't wait. Get the emergency cash you need today!

## ONLINE TITLE LOANS

At Delaware Title Loans, Inc we offer competitive title loans. Turn your car into fast cash for things like medical bills, auto repairs or unexpected expenses.

- No store visit required
- We come to you
- Cash deposited into your account
- Keep your car

## SIGNATURE INSTALLMENT LOANS

Don't own a vehicle? Delaware Title Loans, Inc. offers signature installment loans as an alternative to get the cash you need.

- Unsecured Loans Up To $1,250
- Flexible Payment Periods
- Fast In-Store Approvals
- Convenient Locations



**New Online Title Loans**

Getting an online title loan is easy! No store visit required, we come to you!



**Signature Installment Loans**

Delaware Title Loans, Inc. offers signature installment loans as an easy way to get more cash with more time to pay it back. Up to $1250 with convenient monthly payments.



You will be on your way to our store in no time since the call only takes a few minutes. All you need is the following items:

- Driver's License or State Issued I.D.
- Lien-Free Title to Your Vehicle
- Your Vehicle for Inspection

**Exhibit P-4**          **001**

Google Image © 2019 Google.com

When you're ready to get the emergency cash you need without all the hassles of a traditional loan, Delaware Title Loans, Inc. has you covered. It doesn't matter what has left you in need of cash, because with a car title loan you could get up to $15,000 today.

We also welcome all credit, so fill out our online request form and get started now!

All you have to do to start the process right now is submit our online request form on this page and one of our friendly store associates will call you right back.

Home | Careers | Contact Us | Blog | Site Map | XML | Terms of Use | Privacy Policy

 

Website Accessibility Policy - Accessibility Contact Email - 800-922-8803

© 2019 Delaware Title Loans, Inc. All Rights Reserved.

DISCLOSURE: This is a solicitation for a title loan. This is not a guaranteed offer and requires a complete and approved application. Amount subject to vehicle evaluation. Results and actual loan amounts may vary. Certain limitations apply. This site is affiliated with one or more of the licensed lenders referenced herein.

Chat with us!

**Exhibit P-4**                                      **002**



# How It Works

Thank you for choosing Delaware Title Loans, Inc. for your emergency cash needs. Getting a title loan or signature installment loan with us is fast, easy and convenient. Here's how everything works!

## How Delaware Title and Signature Installment Loans Work:

- You can contact any of our store locations directly by phone, or use our convenient online inquiry form to instantly send your information to the location of your choice to get a fast call back from a friendly store representative.
- Be sure to answer your phone when a representative from the Delaware Title Loans, Inc store you chose calls you right back to confirm your information. They'll then explain the simple required items you'll need to bring with you visiting your local Delaware Title Loans, Inc. store. For **title loans**: your car, clear car title, and government-issued I.D.) you'll need to bring with you. For **signature installment loans**: your photo ID, a proof of income and a checking account statement in your name. This is also your opportunity to ask any questions you have about getting cash in the form of a title or a signature installment loan.
- When you arrive at a Delaware Title Loans, Inc. location, an associate will perform a quick, five-minute inspection of your vehicle for a title loan. After that, they will explain the application process and answer any questions you have.
- After you complete your Delaware title loan application (30 minutes or less) you could get the cash you need.



**New Online Title Loans**

Getting an online title loan is easy! No store visit required, we come to you!



**Signature Installment Loans**

Delaware Title Loans, Inc. offers signature installment loans as an easy way to get more cash with more time to pay it back. Up to $1250 with convenient monthly payments.



Google Image © 2019 Google.com

When you're ready to get the emergency cash you need without all the hassles of a traditional loan, Delaware Title Loans, Inc. has you covered. It doesn't matter what has left you in need of cash, because with a car title loan you could get up to $15,000 today.

You will be on your way to our store in no time since the call only takes a few minutes. All you need is the following items:

- Driver's License or State Issued I.D.
- Lien-Free Title to Your Vehicle
- Your Vehicle for Inspection

We also welcome all credit, so fill out our online request form and get started now!

All you have to do to start the process right now is submit our online request form on this page and one of our friendly store associates will call you right back.

**Exhibit P-4**                    **003**

Home | Careers | Contact Us | Blog | Site Map | XML | Terms of Use | Privacy Policy

 

Website Accessibility Policy - Accessibility Contact Email - 800-922-8803

© 2019 Delaware Title Loans, Inc. All Rights Reserved.

DISCLOSURE: This is a solicitation for a title loan. This is not a guaranteed offer and requires a complete and approved application. Amount subject to vehicle evaluation. Results and actual loan amounts may vary. Certain limitations apply. This site is affiliated with one or more of the licensed lenders referenced herein.

Chat with us!

**Exhibit P-4**                    **004**

# Ballard Spahr
#### LLP

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
TEL 215.665.8500
FAX 215.864.8999
www.ballardspahr.com

Jenny Perkins
Tel: 215.864.8378
Fax: 215.864.8999
perkinsj@ballardspahr.com

February 2, 2021

*Via E-mail (robert.salvin@outlook.com)*

Mr. Robert F. Salvin, Esquire
Philadelphia Debt Clinic
Two Bala Plaza, Suite 300
Bala Cynwyd, PA 19004-1573

Re:    Keith Fenwick

Dear Mr. Salvin:

I write in response to your January 25, 2021 correspondence regarding Keith Fenwick.  This response is made in accordance with Delaware law.

On September 5, 2020, Mr. Fenwick traveled to Delaware where he obtained a loan in the amount of Eight Hundred and Sixteen Dollars ($816.00) from Delaware Title Loans, Inc. ("Delaware Title"). Mr. Fenwick pledged his 2008 Lincoln MKX VIN # 2LMDU88C88BJ24174 as collateral for this loan.  Mr. Fenwick defaulted on this loan.

Upon receipt of your letter, Delaware Title ceased all collection activity.  A copy of Mr. Fenwick's September 5, 2020 Loan Agreement, Promissory Note and Security Agreement, along with a certified accounting of this loan is enclosed herein.

In 2006, Mr. Fenwick traveled to Delaware where he obtained a loan from Delaware Title.  The Contract Number for this 2006 loan is TL-DE0266-060426-2553-00.  This 2006 loan was ultimately paid off via a settlement extended to Mr. Fenwick on September 5, 2020.  Given the age of this loan and Delaware Title's document retention policy, Delaware Title no longer has a copy of the Loan Agreement, Promissory Note and Security Agreement corresponding to Mr. Fenwick's 2006 loan.  A copy of a certified accounting of this 2006 loan is enclosed herein.

Please feel free to contact me if you have any questions.

Very truly yours,

*Jenny Perkins*

Jenny Perkins

Enclosures

DMEAST #43540324 v1

**Exhibit "P-6"**                    001

**Delaware Title Loans, Inc.**

115 Naamans Road
Claymont, DE 19703
Telephone  (302) 793-0877
Facsimile   (302) 793-0910

*Re:* *Accounting for Keith Rendell Fenwick*

**Keith Rendell Fenwick, Customer**

**TL-DE0266-200905-2809-00, Account**

Accounting as of February 2, 2021

Balance
Principal               Interest                Fees
$785.18                 $60.48                  $0.00

Payment History

     See attached.

**TL-DE0266-060426-2553-00, Account**

Accounting as of February 2, 2021

Balance
Principal               Interest                Fees
$0.00                   $0.00                   $0.00

Payment History

     See attached.

Delaware Title Loans, Inc.

**Exhibit "P-6"**                                                      **002**

Case 2:21-cv-04170-BMS   Document 1-1   Filed 09/22/21   Page 31 of 37

Print

**Loan info**

KEITH FENWICK, *Customer*

TL-DE0266-060426-2553-00, *Account*

**Payment history**

| Date | Transaction | Funds amount | Days late | Principal (before) | Balance (before) | Principal (applied) | Interest (applied) | Fees (applied) | Principal (after) | Balance (after) |
|------|-------------|-------------|-----------|--------------------|-----------------|--------------------|--------------------|----------------|-------------------|-----------------|
| 05/13/2006 | Payment received | 150.00 | -13 | 895.00 | 1,020.05 | (24.95) | (125.05) | 0.00 | 870.05 | 870.05 |
| 05/26/2006 | Payment received (extended) | 150.00 | 0 | 870.05 | 963.01 | (57.04) | (92.96) | 0.00 | 813.01 | 813.01 |
| 06/24/2006 | Payment received (extended) | 201.00 | -2 | 813.01 | 1,006.80 | (7.22) | (193.78) | 0.00 | 805.79 | 805.79 |
| 07/28/2006 | Payment received (extended) | 212.00 | 2 | 805.79 | 1,030.97 | (0.00) | (212.00) | 0.00 | 805.79 | 818.96 |
| 08/25/2006 | Payment received (extended) | 205.00 | -1 | 805.79 | 1,004.40 | (6.39) | (198.61) | 0.00 | 799.40 | 799.40 |
| 09/25/2006 | Payment received (extended) | 205.00 | -1 | 799.40 | 1,003.08 | (1.32) | (203.68) | 0.00 | 798.08 | 798.08 |
| 11/03/2006 | Payment received (extended) | 204.00 | 8 | 798.08 | 1,053.90 | (0.00) | (204.00) | 0.00 | 798.08 | 849.90 |
| 09/05/2020 | Payment received (extended) | 200.00 | 5032 | 798.08 | 34,008.48 | (0.00) | (200.00) | 0.00 | 798.08 | 33,808.48 |
| 09/05/2020 | Payoff received (settlement) | 0.00 | 5002 | 798.08 | 33,808.48 | (798.08) | (33,010.40) | 0.00 | 0.00 | 0.00 |
| **Total** | | **1,527.00** | | | | **(895.00)** | **(34,440.48)** | **0.00** | | |

**close**

**Exhibit "P-6"**

003

Print

Loan info

KEITH FENWICK, *Customer*

TL-DE0266-200905-2809-00, *Account*

Payment history

| Date | Transaction | Funds amount | Days late | Principal (before) | Balance (before) | Principal (applied) | Interest (applied) | Fees (applied) | Principal (after) | Balance (after) |
|------|-------------|-------------|-----------|-------------------|------------------|---------------------|---------------------|----------------|-------------------|------------------|
| 09/25/2020 | Payment received (extended) | 72.26 | 0 | 816.00 | 885.75 | (2.51) | (69.75) | 0.00 | 813.49 | 813.49 |
| 10/09/2020 | Payment received (extended) | 52.00 | 0 | 813.49 | 862.17 | (3.33) | (48.67) | 0.00 | 810.16 | 810.16 |
| 10/23/2020 | Payment received (extended) | 51.33 | 0 | 810.16 | 858.64 | (2.86) | (48.47) | 0.00 | 807.30 | 807.30 |
| 11/06/2020 | Payment received (extended) | 51.33 | 0 | 807.30 | 855.61 | (3.03) | (48.30) | 0.00 | 804.27 | 804.27 |
| 11/20/2020 | Payment received (extended) | 51.33 | 0 | 804.27 | 852.39 | (3.21) | (48.12) | 0.00 | 801.06 | 801.06 |
| 12/04/2020 | Payment received (extended) | 51.33 | 0 | 801.06 | 848.99 | (3.40) | (47.93) | 0.00 | 797.66 | 797.66 |
| 12/18/2020 | Payment received (extended) | 51.33 | 0 | 797.66 | 845.39 | (3.61) | (47.72) | 0.00 | 794.05 | 794.05 |
| 01/01/2021 | Payment received (extended) | 51.33 | 0 | 794.05 | 841.56 | (3.82) | (47.51) | 0.00 | 790.23 | 790.23 |
| 01/15/2021 | Payment received (extended) | 51.33 | 0 | 790.23 | 837.51 | (4.05) | (47.28) | 0.00 | 786.18 | 786.18 |
| **Total** | | **483.57** | | | | **(29.82)** | **(453.75)** | **0.00** | | |

**close**



**Exhibit "P-6"**

## LOAN AGREEMENT, PROMISSORY NOTE AND SECURITY AGREEMENT

| | | |
|---|---|---|
| **Lender:** Delaware Title Loans, Inc.<br><br>**Address:** 115 NAAMANS ROAD<br>CLAYMONT, DE 19703<br><br>(302) 793-0877 | **Today's Date:** 09/05/2020 10:18 AM | **Contract #:** TL-DE0266-200905-2809-00 |
| | **Estimated Funding Date:** 09/05/2020 | **Collateral Information**<br>[X] Motor Vehicle:<br>Make: LINCOLN<br>Model: MKX<br>Year: 2008 |
| | **Maturity Date:** 09/09/2022 | |
| **Borrower Information:**<br>Name:   KEITH RENDELL FENWICK<br>Address: 7332 RADBOURNE RD<br>UPPER DARBY, PA 19082<br><br>(267) 348-9744   **DOB:** ▓▓/1969 | **Co-Borrower:**<br>Name: None<br>Address: N/A<br><br>N/A | Vin#: 2LMDU88C88BJ24174<br>License: KYN8236<br><br>[ ] Unsecured |

### Disclosures Made in Compliance with Federal Truth in Lending

| **ANNUAL PERCENTAGE RATE** The cost of your credit as a yearly rate. | **FINANCE CHARGE** The dollar amount the credit will cost you. | **Amount Financed** The amount of credit provided to you or on your behalf. | **Total of Payments** The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 155.32% | $ 1,872.73   (e) | $ 816.00 | $2,688.73   (e) |

**Itemization of Amount Financed:**

| | |
|---|---|
| $  650.00 | Amount given to you directly |
| $  0.00 | Amount paid on your prior account |
| | Amount paid to others on your behalf |
| $  81.00 | Amount paid for lien fees to the Dept. of Motor Vehicles |
| $  85.00 | to Liberty Motor Club* (optional) |
| $  0.00 | to  N/A |
| $  816.00 | **Amount Financed** (Total) |

\* To the extent permitted by applicable law, we may retain or receive a portion of this amount.

**Security:**

[X] You are giving a security interest in the motor vehicle described in the Collateral Information box.

[ ] This loan is unsecured.

**Prepayment:** If you pay off early, you will not have to pay a penalty and will not be entitled to a refund.

**Late Charge:** Any required payment not paid in full within ten (10) days of the due date will be assessed a delinquency charge not to exceed five percent (5%) of the unpaid amount of the payment.

See below for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

Your Payment Schedule (e) will be:

| Number of Payments | Amount of Payments | When Payments Are Due | |
|---|---|---|---|
| 1 | $72.26 | | 09/25/2020 |
| 50 | $51.33 | Every 14 days, beginning | 10/09/2020 |
| 1 | $49.97 | | 09/09/2022 |

(e) means estimated.

This Loan Agreement, Promissory Note and Security Agreement ("Agreement") is executed by and between BORROWER and LENDER on the date set forth above. As used in this Agreement, the terms "we", "us" and "our" mean the LENDER listed above. Similarly, as used in this Agreement, the terms "you" and "your" mean the BORROWER (including any Co-Borrower) listed above.

1.   **Promise to Pay.** Borrower and Co-Borrower, jointly and severally, (collectively hereinafter referred to as "BORROWER") promise to pay to LENDER, in immediately available United States currency, the "Principal" amount of the loan (the Amount Financed), together with interest and other fees and charges as provided in this Agreement. All sums due hereunder shall be paid without prior demand, notice or claim of set off. BORROWER, without penalty, has the right to fully prepay the Amount Financed at any time prior to maturity and will not be obligated to pay any unaccrued interest.

2.   **Estimates in Truth in Lending Act Disclosures.** We had to estimate the Finance Charge, Total of Payments and Payment Schedule in the Truth in Lending Act Disclosure because we do not know exactly when the proceeds of the Loan will be credited to your bank account ("Funding Date"). We based our estimate on your Loan proceeds being disbursed on the Estimated Funding Date shown above. Delays caused by our bank or your bank, bank holidays, or your failure to return any calls we make to you to verify your information and other circumstances beyond our control may result in the Funding Date occurring after the date we estimate.

3.   **Collateral.** If the Motor Vehicle box is checked under the Collateral Information box, this paragraph applies to this Agreement. To secure the BORROWER's obligations under this Agreement, BORROWER hereby grants to LENDER a security interest in the Motor Vehicle described above ("Vehicle"), all accessories and accessions to the Vehicle, and all proceeds related thereto, including all insurance proceeds or refunds of insurance premiums related to the Vehicle (all such property referred to as "Collateral"). BORROWER agrees to provide a valid unencumbered certificate of title to the Vehicle and to pay any amounts paid by LENDER to the Department of Motor Vehicles associated with the recording of LENDER'S security interest, as itemized above,

Page 1 of 5                                   Borrower's Initials:  K.F.

and that such amounts are non-refundable. BORROWER further agrees to reimburse LENDER upon its request for any costs incurred by LENDER in enforcing its rights against the Collateral.

**4.   Interest Rate.**   Interest under this Agreement will be calculated on a simple interest basis commencing on the Funding Date and shall accrue at a daily rate of 1/365 of _156.00 %_ multiplied by the unpaid principal balance (the Principal less the amount the Principal has been reduced by payments) for each day that any amount remains due to LENDER. Interest is computed on the basis of the number of days actually elapsed.

**5.   Payments.**   BORROWER agrees to pay LENDER interest and principal in accordance with the Payment Schedule shown above. LENDER will apply all payments on the date received by LENDER in the following order: (1) unpaid costs and expenses which you have agreed to pay LENDER pursuant to this Agreement; (2) accrued but unpaid interest; and (3) unpaid principal balance. Payments made in addition to regularly scheduled payments will be applied in the same manner. LENDER will not accept an Electronic Payment as your final payment or payoff on your loan, as set forth in your Payment Schedule above, if this loan is secured by a Motor Vehicle.

**6.   Scheduled Payment Amounts.**   The Payment Schedule shown above assumes that all of your payments are made on time. If you are late making a payment, the amount of your last scheduled payment may be greater than disclosed in the Payment Schedule. Likewise, if you are late making a payment, the Finance Charge and Total of Payments may be greater than disclosed above. Interest continues to accrue on the unpaid principal balance, regardless of whether you have been charged a delinquency charge because of a delinquent payment. BORROWER, without penalty, has the right to fully prepay the unpaid principal balance at any time prior to maturity and will not be obligated to pay any unaccrued interest. Any prepayment (except for a prepayment in full) will not relieve BORROWER's obligation to make any later scheduled payment, according to the Payment Schedule above, until all sums due are fully repaid.

**7.   Late Charge.**   Any required payment not paid in full within ten (10) days of the due date will be assessed a delinquency charge not to exceed five percent (5%) of the unpaid amount of the payment.

**8.   BORROWER's Representations and Warranties.**   BORROWER represents and warrants that BORROWER has the right to enter into this Agreement, is at least 18 years of age, and understands and acknowledges that no credit insurance is offered with this Agreement. If the Motor Vehicle box is checked under the Collateral Information box, BORROWER further represents and warrants that the Vehicle is not stolen, has no liens or encumbrances against it, that BORROWER will not attempt to transfer any interest in the Vehicle until all obligations under this Agreement have been paid in full, and that the Vehicle will not be moved from the BORROWER's state of residence. BORROWER further warrants that until such time as all amounts due hereunder are fully repaid, BORROWER will not attempt to seek a duplicate title to the Vehicle.

**9.   Event of Default.**   The following constitute events of default under this Agreement: (a) BORROWER does not pay the full amount of any required payment when due; (b) BORROWER fails to keep any of BORROWER's promises under this Agreement; or (c) any representation or information given to the LENDER by BORROWER is false or misleading.

**10.   LENDER's Rights in the Event of Default.**   Upon the occurrence of any event of default, the LENDER may at its option, do any one or more of the following: (a) declare the whole outstanding balance due under this Agreement due and payable at once and proceed to collect it; (b) foreclose upon its lien and liquidate any Collateral securing this Agreement according to law, including by using self-help repossession (if applicable); (c) exercise all other rights, powers and remedies given by law; and (d) recover from BORROWER all charges, costs and expenses, including all collection costs and reasonable attorney's fees incurred or paid by the LENDER in exercising any right, power or remedy provided by this Agreement or by law. In the event of default, the interest shall continue to accrue until the unpaid principal balance, together with all accrued and unpaid interest and costs, is fully repaid.

**11.   Notices.**   Any notice that LENDER is required to provide under this Agreement or applicable law will be declared reasonable if sent to BORROWER at the address set forth above via regular mail. Each notice will become effective three (3) days after it is mailed. It is BORROWER's responsibility to keep the listed address current and provide LENDER with written notice of any change in address.

**12.   General.**   (a) BORROWER will deposit a duplicate set of keys to the Motor Vehicle upon execution of this Agreement (if applicable); (b) BORROWER agrees to pay LENDER a returned check fee of $25.00 each time a check given to LENDER by BORROWER is not honored for any reason; (c) BORROWER shall bear the entire risk of loss or damage to the Vehicle while it is in BORROWER's possession and agrees to indemnify and hold LENDER harmless from any and all claims for property damages or personal injuries arising from the operation of the Vehicle, including but not limited to, all judgments, attorney's fees, court costs and any incurred expenses (if applicable); (d) if more than one BORROWER executes this Agreement, each BORROWER will be jointly and severally liable; (e) time is of the essence of this Agreement; and (f) this Agreement constitutes the entire Agreement between the parties and no other agreements, representations or warranties other than those stated herein shall be binding unless reduced in writing and signed by both parties.

**13.   Governing Law; Enforceability.**   This Agreement shall be construed, applied and governed by the laws of the State of Delaware. The unenforceability or invalidity of any portion of this Agreement shall not render unenforceable or invalid the remaining portions hereof.

**14.   ARBITRATION PROVISION.**   This Arbitration Provision describes when and how a Claim (as defined below) may be arbitrated. Arbitration is a method of resolving disputes in front of one or more neutral persons, instead of having a trial in court in front of a judge and/or jury. It can be a quicker and simpler way to resolve disputes.

**READ THIS ARBITRATION PROVISION CAREFULLY AS IT WILL HAVE A SUBSTANTIAL IMPACT ON HOW LEGAL CLAIMS YOU AND WE HAVE AGAINST EACH OTHER ARE RESOLVED.**

**YOU HAVE THE RIGHT TO REJECT (NOT BE BOUND BY) THIS ARBITRATION PROVISION AS DESCRIBED BELOW. If you do not reject this Arbitration Provision and a Claim is arbitrated, neither you nor we will have the right to: (1) have a court or a jury decide the Claim; (2) engage in information-gathering (discovery) to the same extent as in court; (3) participate in a class action, private attorney general or other representative action in court or in arbitration; or (4) join or consolidate a Claim with claims of any other person. The right to appeal is more limited in arbitration than in court and other rights in court may be unavailable or limited in arbitration.**

**(a)**  *Special Definitions:* As solely used in the Arbitration Provision, the terms "we," "us" and "our" mean (i) the Lender (listed on the top of the first page of this Agreement), its parent companies, wholly or majority-owned subsidiaries, affiliates, successors, assigns and any of their employees, officers and directors, and (ii) any third party providing any goods and services in connection with the origination, servicing or collection of this Agreement. "You" means Borrower (including any Co-Borrower) listed on the top of the first page of this Agreement.

**(b)**  ***Your Right to Reject:***  If you don't want this Arbitration Provision to apply, you may reject it by mailing us a written rejection notice which contains all of the following: (i) the date of this Agreement and a description of the Motor Vehicle (if applicable); (ii) the names, addresses and phone numbers of each of the Borrowers for this Agreement; and (iii) a statement that all of the Borrowers reject the Arbitration Provision of this Agreement. The rejection notice must be sent by certified mail, return receipt requested, to _Delaware Title Loans, Inc._____ at: P.O. Box 500785 Atlanta, Georgia, 31150, Attn: Arbitration Rejection Notice. A rejection notice is only effective if it is signed by all Borrowers and Co-Borrowers and if we receive it within thirty (30) days after the date of this Agreement. If you reject this Arbitration Provision, that will not affect any other provision of this Agreement or the status of your Agreement. If you don't reject this Arbitration Provision, it will be effective as of the date of the Agreement. If you reject this Arbitration Provision, that will not

Borrower's Initials: _KF._____

**Exhibit "P-6"**

**006**

constitute a rejection of any prior arbitration provision between you and us. Even if you previously rejected an arbitration provision between you and us, you will be bound by this Arbitration Provision unless you reject it.

(c) *Federal Arbitration Act:* The parties agree and acknowledge that this Arbitration Provision and this Agreement evidence a transaction involving interstate commerce and, therefore, a federal statute, the Federal Arbitration Act (Title 9 of the United States Code) ("FAA"), shall govern the interpretation and enforcement of this Arbitration Provision and proceedings pursuant thereto. To the extent state law is applicable under and is not preempted by the FAA, the law of the state applicable under the paragraph of this Agreement titled "Governing Law" shall apply.

(d) *What Claims Are Covered:* "Claim" means any claim, dispute or controversy between you and us, whether preexisting, present or future, that in any way arises from or relates to this Agreement or the Motor Vehicle securing this Agreement (if applicable), any prior loan or loans you obtained from us, the events leading up to the Agreement or any prior loan (for example, any disclosures, advertisements, promotions or oral or written statements made by us), any product or service provided by us or third parties in connection with the Agreement, the collection of amounts due and the manner of collection, our use or disclosure of information about you or your loan(s), or the relationships resulting from any of the foregoing. "Claim" has the broadest possible meaning, and includes initial claims, counterclaims, cross-claims and third-party claims, federal, state, local and administrative claims and claims which arose before the effective date of this Arbitration Provision. It includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, statute, regulation, ordinance, common law and equity and claims for monetary damages and injunctive or declaratory relief.

However, "Claim" does not include: (i) any dispute or controversy about the validity, enforceability, coverage or scope of this Arbitration Provision or any part thereof (including, without limitation, the definition of "Claim," the Class Action Waiver in subparagraph (h) below; subparts (A) and (B) of subparagraph (n) below titled "Severability and Survival" and/or this sentence); all such controversies are for a court and not an arbitrator to decide. But any dispute or controversy that concerns the validity or enforceability of the Agreement as a whole is for the arbitrator, not a court, to decide; (ii) the exercising of any self-help or non-judicial remedies by you or us, for example, our right to enforce our security interest and to obtain possession of the Collateral by using self-help (if applicable; (iii) any individual action in court by one party to prevent the other party from using a self-help remedy, as opposed to any related request for damages or monetary relief of any kind, which is a "Claim"; or (iv) any individual action brought by you or us in small claims court, or your State's equivalent court. However, if that small claim action is transferred, removed or appealed to a different court, you or we then have the right to choose arbitration. Moreover, this Arbitration Provision will not apply to any Claims that are the subject of a class action filed in court that is pending as of the effective date of this Arbitration Provision in which you are alleged to be a member of the putative class for as long as such class action is pending. In addition to offering loans such as represented by this Agreement, Lender from time to time may offer other loans and/or products. If you are also a party to any other loan agreement of any type with Lender, the arbitration provision in that loan agreement shall apply to that agreement.

(e) *Electing Arbitration; Starting an Arbitration Proceeding:* Either you or we may elect to arbitrate a Claim by giving the other party written notice of the intent to arbitrate the Claim or by filing a motion to compel arbitration of the Claim. This notice may be given before or after a lawsuit has been filed concerning the Claim or with respect to other Claims brought later in the lawsuit, and it may be given by papers filed in the lawsuit. Each of the arbitration administrators listed below has specific rules for starting an arbitration proceeding. Regardless of who elected arbitration or how arbitration was elected, the party asserting the Claim (i.e., the party seeking money damages or other relief from a court or an arbitrator) is responsible for starting the arbitration proceeding. Thus, if you assert a Claim against us in court, and we elect to arbitrate that Claim by filing a motion to compel arbitration which is granted by the court, you will be responsible for starting the arbitration proceeding. Even if all parties have opted to litigate a Claim in court, you or we may elect arbitration with respect to any Claim made by a new party or any Claim later asserted by a party in that or any related or unrelated lawsuit (including a Claim initially asserted on an individual basis but modified to be asserted on a class, representative or multi-party basis). Nothing in that litigation shall constitute a waiver of any rights under this Arbitration Provision.

(f) *Choosing the Administrator:* The arbitration administrator will be: American Arbitration Association ("AAA"), 1633 Broadway, 10th Floor, New York, NY 10019, www.adr.org 1-800-778-7879; or JAMS, 620 Eight Avenue, 34th Floor, New York, NY 10018, www.jamsadr.com, 1-800-352-5267. You may contact these organizations directly if you have any questions about the way they conduct arbitrations or want to obtain a copy of their rules and forms (which are also available on their websites). However, if the AAA and JAMS are unable or unwilling to serve as administrator, the parties may agree upon another administrator or, if they are unable to agree, a court shall select the administrator or arbitrator. No company may serve as administrator, without the consent of all parties, if it adopts or has in place any formal or informal policy that is inconsistent with and purports to override the terms of the Class Action Waiver in this Arbitration Provision.

(g) *The Arbitrator:* A single arbitrator will be appointed by the administrator and must be a practicing attorney who is a member of the Delaware State Bar with ten or more years of experience or a retired Delaware state or federal court judge.

(h) *Class Action Waiver:* Notwithstanding any other provision of this Agreement, if either you or we elect to arbitrate a Claim, neither you nor we will have the right: (a) to participate in a class action, private attorney general action or other representative action in court or in arbitration, either as a class representative or class member; or (b) to join or consolidate Claims with claims of any other persons (thus, Claims brought by or against one Borrower (or Co-Borrower) may not be joined or consolidated in the arbitration with Claims brought by or against any other borrower who obtained a different agreement). No arbitrator shall have authority to conduct any arbitration in violation of this provision or to issue any relief that applies to any person or entity other than you and/or us individually. (Provided, however, that the Class Action Waiver does not apply to any lawsuit or administrative proceeding filed against us by a state or federal government agency even when such agency is seeking relief on behalf of a class of borrowers including you. This means that we will not have the right to compel arbitration of any claim brought by such an agency).

(i) *Location of Arbitration:* Any arbitration hearing that you attend must take place within the State of Delaware in the county where you signed the Agreement.

(j) *Cost of Arbitration:* At your written request, we will pay all filing, hearing and/or other fees charged by the administrator and arbitrator to you for Claim(s) asserted by you in an individual arbitration after you have paid an amount equivalent to the fee, if any, for filing such Claim(s) in state or federal court (whichever is less) in the judicial district in which you reside. (If you have already paid a filing fee for asserting the Claim(s) in court, you will not be required to pay that amount again). In addition, the administrator may have a procedure whereby you can seek a waiver of fees charged to you by the administrator and arbitrator. We will always pay any fees or expenses that we are required to pay by law or the administrator's rules or that we are required to pay for this Arbitration Provision to be enforced. We will not ask you to pay or reimburse us for any fees we pay the Administrator.

(k) *What Law the Arbitrator will Apply:* The arbitrator will be bound by judicial rules of procedure and evidence that would apply in a court, nor by state or local laws that relate to arbitration proceedings. The arbitrator will apply the same statutes of limitation and privileges that a court would apply if the matter were pending in court. (A "statute of limitations" is the time period allowed by law for initiating a lawsuit or other court action). In determining liability or awarding damages or other relief, the arbitrator will follow the applicable substantive law, consistent with the FAA, that would apply if the matter had been brought in court. The arbitrator may award any damages or other relief or remedies that would apply under applicable law to an individual action brought in court, including, without limitation, punitive damages (which shall be governed by the Constitutional standards employed by the courts) and injunctive, equitable and declaratory relief (but only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim). The arbitrator will have the authority to award fees and costs of attorneys, witnesses and experts to the extent permitted by the

Borrower's Initials: KF

Agreement, the administrator's rules or applicable law.  However, with respect to Claim(s) asserted by you in an individual arbitration, we will pay your reasonable attorney, witness and expert fees and costs if and to the extent you prevail, if applicable law requires us to or if we must bear such fees and costs in order for this Arbitration Provision to be enforced.

**(l)** *Right to Discovery*:  In addition to the parties' rights to obtain discovery pursuant to the arbitration rules of the administrator, either party may submit a written request to the arbitrator to expand the scope of discovery normally allowable under the arbitration rules of the administrator.  The arbitrator shall have discretion to grant or deny that request.

**(m)** *Arbitration Result and Right of Appeal*:  At the timely request of either party, the arbitrator shall write a brief explanation of the grounds for the decision.  Judgment upon the award given by the arbitrator may be entered in any court having jurisdiction.  The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA.  However, if the amount of the Claim exceeds $50,000, any party can, within 14 days after the entry of the award by the arbitrator, appeal the award to a three-arbitrator panel administered by the administrator.  The panel shall reconsider anew any aspect of the initial award requested by the appealing party.  The decision of the panel shall be by majority vote.  Reference in this Arbitration Provision to "the arbitrator" shall mean the panel if an appeal of the arbitrator's decision has been taken.  The costs of such an appeal will be borne in accordance with subparagraph (j) above, captioned "Costs of Arbitration." Any final decision of the appeal panel is subject to judicial review only as provided under the FAA.  No arbitration award involving the parties will have any preclusive effect as to issues or claims in any dispute involving anyone who is not a party to the arbitration, nor will an arbitration award in prior disputes involving other parties have preclusive effect in an arbitration between the parties to this Arbitration Provision.

**(n)** *Severability and Survival*:  If any part of this Arbitration Provision is deemed or found to be unenforceable for any reason, the remainder shall be enforceable, except that:

(A) The parties acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between them and is non-severable from this Arbitration Provision.  If the Class Action Waiver is limited, voided or found unenforceable, then this Arbitration Provision (except for this sentence) shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver.  The parties acknowledge and agree that under no circumstances will a class action be arbitrated; and

(B) if a Claim is brought seeking public injunctive relief and a court determines that the restrictions in the Class Action Waiver or elsewhere in this Arbitration Provision prohibiting the arbitrator from awarding relief on behalf of third parties are unenforceable with respect to such Claim (and that determination becomes final after all appeals have been exhausted), the Claim for public injunctive relief will be determined in court and any individual Claims seeking monetary relief will be arbitrated.  In such a case the parties will request that the court stay the Claim for public injunctive relief until the arbitration award pertaining to individual relief has been entered in court.  In no event will a Claim for public injunctive relief be arbitrated.

This Arbitration Provision shall survive the repayment of all amounts owed under this Agreement, any legal proceeding, or any use of a self-help remedy by us to collect a debt owed by you to us, and any bankruptcy by you, to the extent consistent with applicable bankruptcy law.

**(o)** *Conflicts*:  Arbitration of a Claim must comply with this Arbitration Provision.  In the event of a conflict between the provisions of this Arbitration Provision, on the one hand, and any applicable rules of the AAA or JAMS or other administrator used or any other terms of this Agreement, on the other hand, the provisions of this Arbitration Provision shall control.  This Arbitration Provision supersedes any other arbitration provision between the parties that may otherwise be applicable.

**(p)** *Notice and Cure; Special Payment*:  Prior to initiating a Claim, you may send us a written Dispute Claim Notice.  In order for a Dispute Claim Notice to be valid and effective, it must: (a) state your name, address and Contract Number; (b) be signed by you; (c) describe the basis of your Claim and the amount you would accept to resolve the Claim; (d) state that you are exercising your rights under the "Notice and Cure" paragraph of the Arbitration Provision; and (e) be sent to us by certified mail, return receipt requested, at _____ Delaware Title Loans, Inc. _____, P.O. Box 500785 Atlanta, Georgia, 31150, Attn: Dispute Claim Notice.  This is the only method by which you can submit a Dispute Claim Notice.  You must give us a reasonable opportunity, not less than 30 days, to resolve the Claim.  If, and only if, (i) you submit a Dispute Claim Notice in accordance with this paragraph on your own behalf (and not on behalf of any other party); (ii) you cooperate with us by promptly providing the information we reasonably request; (iii) we refuse to provide you with the relief you request before an arbitrator is appointed; and (iv) the matter then proceeds to arbitration and the arbitrator subsequently determines that you were entitled to such relief (or greater relief), you will be entitled to a minimum award of at least $7,500 (not including any arbitration fees and attorneys' fees and costs to which you will also be entitled).  We encourage you to address all Claims you have in a single Dispute Claim Notice and/or a single arbitration.  Accordingly, this $7,500 minimum award is a single award that applies to all Claims you have asserted or could have asserted in the arbitration, and multiple awards of $7,500 are not contemplated.

**(q)** *U.S. Constitutional Issues*:  To the extent that any Claim or defense to any Claim requires a determination under the United States Constitution (a "Constitutional Determination"), such Constitutional Determination must be decided by a court, not an arbitrator.  You and we agree that: (A) the arbitration of such Claim will be stayed until such Constitutional Determination is finally resolved by a court judgment that is not or is no longer subject to appeal; and (B) the arbitrator will render his or her award in accordance with such Constitutional Determination.

---

> **DO NOT SIGN THIS AGREEMENT BEFORE YOU HAVE READ IT, INCLUDING THE ARBITRATION PROVISION, OR IF IT CONTAINS ANY BLANK SPACES.  YOU WILL RECEIVE A COMPLETED COPY OF THIS AGREEMENT.**

**Exhibit "P-6"**

IN WITNESS WHEREOF, the parties have hereunto set forth their hands and seals on the date stated above.

E-SIGNED by KEITH FENWICK
_____
Borrower

LENDER

_Troy E. Fields_
_____
by:  Its Authorized Representative

_____
Co-Borrower

---

**Authorization to Deliver Advertisements or Telemarketing Messages Using Text Messages, E-Mails & Other Electronic Communications**

You hereby authorize us to deliver or cause to be delivered to you advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice. You hereby further authorize us to deliver these messages via e-mails, text messages and other electronic communications to the telephone number and e-mail listed below. To receive such communications you must provide a valid e-mail address, telephone number or other contact information for an applicable communications device. You should be aware that your wireless provider or other communications carrier may charge you applicable text messaging rates for each text message or other electronic communication that is sent to you or received by you. You represent to us that you are the owner or an authorized user of the wireless or other communications device for which you have provided an e-mail address, a telephone number or other contact information. You understand that receipt of this loan is not conditioned upon your consent to this authorization.

-Your e-mail address:  keith.fenwick69.my@gmail.com

-Your mobile phone number:  (267) 348-9744

-Your Signature: _____    -Date: ____09/05/2020____

---

DEtitle&sig02132019
DEInstallmentNDF20190213.pdf

Borrower's Initials: __K.F.__

FILED
08-13-2021 06:03 PM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

**Exhibit "P-6"**

009